We will hear argument first this morning in Case 19-511, Facebook v. Duguid. Mr. Clement? Mr. Chief Justice, and may it please the Court, the TCPA defines an automatic telephone dialing system as equivalent with the capacity to store or produce telephone numbers to be called using a random or sequential number generator and to dial such number. The statute prohibits calls using an ATDS to emergency and cellular lines, but not to residential lines. Under well-established rules of grammar and statutory construction, the entire phrase, telephone numbers to be called using a random or sequential number generator, applies to both disjunctive verbs, store or produce. The contrary reading covers any device that can store and dial numbers, even without the use of a random or sequential number generator. That reading creates a statute of impossible breadth and a fundamental mismatch between the ATDS definition and the targeted ATDS prohibitions. Under ordinary rules of grammar, a restrictive modifier that follows two disjunctive verbs modifies both, not just the second one. Three features of the statutory text here reinforce that conclusion. First, the punctuation. The modifying phrase here is set off by a comma, which indicates that the phrase modifies both verbs. Second, the shared direct object. The direct object that follows produce, telephone numbers to be called, concededly applies equally to store as well as produce. Having some, but not all, of the text that follows produce refer back to store requires a significant judicial rewrite. Third, the scope of the ATDS prohibitions. They do not prevent ATDS calls to the residential landlines used by most Americans in 1991. Instead, they target only the specialized lines, emergency, cellular, and multiple business lines that were distinctly vulnerable to random and sequential dialing. That limited scope makes sense as a targeted response to the problems of random or sequential dialing. But if Congress were really aiming at annoying calls from devices that could store or dial numbers, its failure to protect the home front would be inexplicable. Mr. Clement, your friend on the other side says that we ought to look to the sense of the passage and not to rules of syntax. I know you have a dispute about what the sense of the passage is, but as a general matter, he's right, isn't he? I mean, the drafters here weren't following the rule of redondo, singula, singulus, or diagramming these sentences. So why should we focus on syntax to the extent that I think both parties do? Well, your honor, I think because the other way lies madness, with all due respect. I mean, I think if one deviates from the rules of sort of ordinary grammar and statutory construction, then there becomes so much play in the joints that you essentially empower the judiciary to rewrite statutes. And with all respect to my friends on the other side, I think that's really what they invite you to do here. I think Congress targeted a very specific problem in this provision, a problem that was prevalent in 1991. I think it was successful in eradicating that specific technology, and my friend would like to use the senescence or the sense of the statute to repurpose the statutory prohibition to address more modern ills. As you say, and the modern ills, at least according to your friend, would lead to a disaster if his interpretation weren't adopted. Is that something we should consider at all? I don't think it's something you should really consider, and I think it gives too little credence to Congress's own ability to address these problems in an ongoing way. As recently as 2019, Congress passed another statute addressed to the problem of accepted telemarketing calls. One of the things that that act did is to try to create a process where the technology we use in our home phones and our cellular phones would itself block these kind of unwanted calls. Thank you. Thank you, Counsel. Justice Thomas? Thank you, Mr. Chief Justice. Mr. Clement, I know this isn't central to your case, but I am interested in why a text message is considered a call under the TCPA. Well, Justice Thomas, I actually think that's an excellent question, and I think it is another way in which the courts have essentially updated the statute to keep up with the times. And it's not at all clear that a statute that was directed not just at calls, but also in particular at artificial or prerecorded voice calls, is really sensibly applied to text at all. And if one were to hold that the statute were limited to actual voice calls and not to text, that would be an alternative route for ruling in our favor in this case. The one other thing I would point to, Justice Thomas, is there is an amicus brief by the Washington Legal Foundation that addresses this issue specifically. And what they point out is that in more recent statutes, when Congress addresses calls and texts, they do so either conjunctively or disjunctively. But I think that gives real evidence to the fact that one doesn't naturally talk about a text as a call, but rather one talks about either calls I've received on my phone or texts I've received. When we talk about a number generator under the TCPA, are we talking about a device as a number generator or a process? It would seem that perhaps it would make more sense that it would be a device, but what's your thought on that? Justice Thomas, I think the statute's most likely read as talking about a process that is part of overall equipment. So I think they may have had in mind a computer program that would be part of the overall equipment that's used to store or produce a number using the random or sequential number generator and then to dial that number. Thank you, counsel. Justice Breyer? Well, my only question was in light of your answer to the Chief Justice. I think you say in your brief, and it seems right to me, is that if we take your friend's or opponent's definition, then it would be unlawful for a person to use a cell phone, I guess, that stores numbers, like an emergency hospital number, to make a call to the emergency line of the hospital. I think you say something like that. Is that right? That's right, Justice Breyer. And were you telling the Chief Justice that's irrelevant? No, I didn't mean to tell the Chief Justice that that was irrelevant. I think that the scope of the statute… Wouldn't you say it's fairly important? I mean, if it produces a very peculiar or weird result, it does have something to do with interpretation, doesn't it? Oh, absolutely. All I was responding to is the idea that rather than looking at the results produced by the actual words and their syntax, whether we start creeping into this concept of senescence, which may be en vogue in grammarian circles, but I really don't think that's something that's featured in this Court's cases. And I think in order to make a general point that both consequences and purposes and text are all relevant, and in this case you have a pretty strong claim, in my opinion, and I'll ask your colleague, your friend, you have a pretty strong case on the consequences and purposes. Well, obviously, Justice Breyer, there's a range of views on this Court as to how much one looks beyond the text to sort of context and consequences. I think happily here, I think text, context, and consequences all point in favor of our proposed construction of the text. I realize you do. I realize you do. Thank you. Justice Alito? Justice Alito? Sorry. Mr. Kuhlman, the statutory phrase that we have to interpret in this case has a structure that is fairly common. It lists two activities, storing or producing telephone numbers, followed by a modifying phrase, using a random or sequential number generator. People make statements like that all the time. And you know what? Those who hear them or read them understand what they mean without looking at treatises on grammar, syntax, usage, or interpretation. And the way they do that is to ask, what makes sense? I could give you lots of examples, but I have very little time for questioning. So they ask about the sense of it before they get to all this arcane stuff. So the question that jumps out here is this. Does it make any sense to speak about storing a list of telephone numbers using a random or sequential number generator? The best answer I can find in the briefs on your side is that there were systems that produced lists of numbers using such a generator and then stored them. But unless you can explain how a generator was used in the very process of storing the numbers, I think you have a problem. So Justice Alito, two quick things on that. One is, I do think readers of language have an advantage over listeners, which is they can look for the punctuation. And I do think the punctuation here is important. But to get to the heart of your question, I don't think there's anything nonsensical or redundant about talking about using a random number generator to store numbers. I think it's not any different in principle with the phrase that a lot of people have used to describe the sense of the ATDS prohibition, which prohibits dialing of numbers using a random or sequential number generator. In both contexts, I think the sentences are very sensible. They just mean that you're using the number generator not to do the actual dialing or the actual storing, but as part of the process of storing telephone numbers to be called, or part of the process of dialing telephone numbers to be called. And I think if you understand the terms in that way, they make perfect sense in normal English. And I think what they really get at is the idea that Congress was trying to prohibit the use of a random or sequential number generator, either for immediate dialing, which would be produced, or for later dialing, which would be captured even more aptly by the verb to store. Justice Sotomayor? Mr. Clement, with your parade of horribles that it read the way the other side wants, it would cover devices, too many devices. I'm wondering if the issue is less with respondents' interpretation and more so with the TCPA being outdated. When the Act was passed nearly 30 years ago, smart phones didn't even exist. Even today, it still references pagers, the TCPA. But you are right to note that today almost all phones have the ability to store and dial telephone numbers. If what Congress wanted to do was stop a call that was automatic, and that's what it's accomplished, wouldn't it be its job, not ours, to update the TCPA to bring it in line with the times? So, Justice Sotomayor, I definitely think that it's Congress's job to update the statute. But I don't think the problem with the other side's construction is something that only materializes with the modern smart phone. I think the basic problem also adhered in technology that was prevalent in 1991, like speed dialing or call forwarding, which involves the rudimentary capacities to store numbers and to dial them. And the FCC confronted that issue in the immediate wake of the statute's passage in a 1992 rulemaking. And it said, don't worry about speed dialing, don't worry about call forwarding, that's not covered because it doesn't use a random or sequential number generator. So I think there's, you know, the entire history of the TCPA, there's been the potential for it to be read way too broadly. And I think since the very beginning, the sensible way to avoid that outcome is to read using a random or sequential number generator to modify both to store and to produce. Thank you, counsel. Justice Kagan? Mr. Clements, I'd like to give you a hypothetical along the lines that Justice Alito was talking about. So here's the sentence. It is illegal to stab or shoot another person using a firearm. And what I want to know is, would I be covered if I stabbed somebody with a knife? I think you would, Justice Kagan. You would obviously be covered if you stabbed somebody using a bayonet, I suppose. But I think that really gets to some of the sense that you provided in the Supreme Court decision in the Advocate Health case, which there are certain combinations of word where the mind just sort of rebels at the combination of the two words. And I think there it's very clear that you really don't in the ordinary parlance except for possibly with a bayonet, stab somebody using a firearm. But I don't think there's any comparable logical inconsistency or linguistic impossibility with using equipment to store telephone numbers to be called using a random or sequential number generator. And indeed, if you look at some of the state statutes that were passed before the TCPA, they all used a bunch of different formulations, but a number of them did address the combination of storage technology and a random or sequential number generator. And I think that is a real problem, not a famed problem or an odd combination, particularly if you think about sequential number generation, where you generate thousands of numbers, you have to store them someplace. And it's really the fact that you're using the equipment to store the numbers and then dial them seriatim that creates the distinct risks to emergency lines and cellular phones and pager lines and the rest. And quickly, Mr. Clement, could you comment on the surplusage problem that your reading creates? So I don't think it creates a surplusage problem, Justice Kagan, and I do think the other side's reading creates a bigger surplusage problem. So on our side, I don't think there's a surplusage problem. Because if I talked about using a power generator to store or produce electricity, I don't think you would read that as having the store to being completely redundant, because by using store or produce, I've been making clear I don't really care whether you're using the electricity now or later. So I don't think it's purely redundant. On the other hand, Justice Gorsuch? Good morning, Mr. Clement. You pressed what Judge Barrett, in her opinion for the Seventh Circuit, called the first potential reading. But the problem that it generates, as everybody's recognized, so to speak, is that it's awkward to speak of equipment storing anything using a random number generator. That's what Justice Alito and Justice Kagan have pointed out. One potential response to that might be what Judge Barrett called the fourth potential reading, which is to say that the phrase using a random or sequential number generator modifies the object rather than the verbs. And it would be sensible to talk about storing telephone numbers that are to be called using a random number generator. The problem there, of course, is a comma. I see all that. My question for you is, you didn't raise the fourth argument as a potential. I'm not sure we need to rule it out. But would it make any difference to you and your clients in any sensible way, make a difference in the real world, whether we're adopting the first alternative or saying that the fourth might be a possibility, too? Justice Gorsuch, I think we would prevail equally under the fourth alternative. And as I'm standing here today, I can't think of a practical difference between the two. Obviously, when we're formulating our arguments, it's hard for us to ignore the comma, which is part of the reason we didn't press the fourth construction. The other reason we didn't press it, to be candid, is if you don't think there's anything terribly anomalous about talking about calling using a random or sequential number generator, then I don't know why you think there's something so anomalous about storing numbers using a random or sequential number generator. I think in both contexts, it's not the generator itself that does the calling or the storing, but in both cases, the number generator is used as part of the storage process or part of the calling process. Very helpful. Thank you. Justice Kavanaugh? Thank you, Chief Justice. Good morning, Mr. Clement. I want to touch on what you talked about, what Congress was getting at in 1991, and just make sure I understand the structure of the statute. Your point about calls to the home, only artificial or prerecorded calls to the home were prohibited. Why didn't Congress also prohibit live calls, live telemarketing calls to the home, do you think? I think it's pretty clear from both the legislative history and the legislative findings that were enacted in the statute itself that the reason they didn't go after live voice calls to the home was out of respect for the First Amendment. And then when you get to the other category of calls we're talking about, to the specialized numbers, Congress again prohibits the artificial or prerecorded voice calls, but then also prohibits calls which would presumably be live caller calls using an ATS, an ATDS. What was, in your view, Congress getting at with those calls? Am I right in thinking those are live caller calls that would necessarily be covered by the ATDS prohibition? Well, they could, I think, be live caller calls. There's actually some debate about that. And I think if you look at the whole legislative history, there's a little bit of ambivalence about that. But let's say they called voice calls. I think the reason that they targeted those specialized lines, and as to those specialized lines prohibited the ATDS in addition to the artificial or prerecorded voice calls when they didn't do the same to the residential landlines, is precisely because those were the lines that were particularly vulnerable to random or sequential number generation technology. Right. The artificial or prerecorded calls to those lines would have been already prohibited, though. So the ATDS must be getting, and I don't know which way this cuts, I'm just trying to understand it, would have been using that, an ATDS for a live caller call would have been the only thing separately covered. Yeah, I'm not positive that's the way the statute is structured, Your Honor, because I think the prohibition to the residential lines only covers artificial or prerecorded voice calls. And then as to the cellular and business lines and emergency lines, both are prohibited. Thank you, counsel. They specifically singled out the cellular and mobile lines and the emergency lines, and they said as to those, we don't want either artificial or prerecorded voice calls, or... Thank you, counsel. ...we don't want these ATDS calls. Justice Barrett? Mr. Clement, some of the lower courts that have adopted your opponent's interpretation have been moved by the exception in B, which says that liability doesn't attach if the call is made for emergency purposes or with the prior express consent of the called party. And, you know, they've pointed out that under your interpretation, they say, listen, the prior express consent would do no work for an ATDS. Well, I'm looking at the emergency purposes exception to liability, and I'm wondering how either an ATDS or an automated or artificial prerecorded voice device would make a call for emergency purposes. So, Justice Barrett, I think you could imagine either one of them making a call. You know, if there were a medical emergency, if there were an individual at large in the community, you could imagine a police department using this kind of technology to provide a warning message, and it could be a prerecorded warning message to everybody in the jurisdiction. So you think it would have some utility. I mean, I guess what I'm getting at here is I'm wondering whether, in an abundance of caution, you can imagine why Congress wouldn't want any call that was placed for emergency purposes or a call that was placed with express consent to give rise to liability. However, I mean, it may not be that there's very wide applicability for either one of those exceptions, including the one for emergency services, which I think would deprive the objection of some of its force, that your interpretation renders the prior consent of not great utility. I think it's going to be a narrow band of calls, but I do think they're calls that conceivably could be made with an ATDS, so I think the exception has some force. I do think, though, if you read the statute as a whole, it's pretty clear that the exceptions are mostly in there for the prerecorded or artificial voice calls because there's no exception in D1D, which is the one provision that applies only to ATDS calls. Thank you, Counsel. A minute to wrap up. Mr. Clement? Thank you. There are two final defects with Respondent's View I'd like to emphasize. Under our reading, both disjunctive verbs are modified, and so both capture specialized conduct of comparable scope. Under Respondent's Reading, by contrast, to store is unmodified and captures a wide swap of conduct, while to produce using a random or sequential number generator captures only a narrow band of specialized conduct. That is not how Congress generally writes statutes. It does not put an elephant hole next to a mouse hole, prohibiting both everything under the sun and a highly specialized practice, and that points to the second problem. If Congress really wanted to prohibit every annoying call made with a device that can store and dial numbers, it would not have left the home front unprotected. In 1991, there were only about 7 million cell phones. The default telephone for almost every constituent represented in Congress was a residential landline. If the ATDS provisions were addressed to something broader than random or sequential dialing, Congress's decision to leave the residential landlines unprotected would be inexplicable. Thank you, Counsel. Mr. Ellis? Mr. Chief Justice, and may it please the Court. In the government's view, this case can and should begin and end with a statutory text. Under ordinary rules of grammar and canons of construction, the phrase, using a random or sequential number generator, in Section 227A1A, is best read to modify, both store and produce. Now, the respondent asks this Court to discard those rules and rely instead on the anti-grammatical sense of the passage, but he cannot show the sort of contextual implausibility of a grammatical reading that might warrant that approach. He also places significant weight on the purported consequences of the government's reading on the modern telemarketing industry, but that argument misconceives the limited role that the ATDS definition plays in the statutory scheme, both today and, more importantly, from the perspective of the 1991 Congress. Regardless of how the Court resolves this case, the TCPA will continue to broadly prohibit robocalls to cell phones and residential lines. The fact that the 1991 ATDS definition describes a universe of devices that are no longer in widespread use provides no basis for this Court to adopt anything other than the most natural reading of the statutory text. I welcome the Court's questions. Mr. Ellis, you began by saying this case can begin and end with the statutory text. Are you saying it's a plain-meaning case? We think, Your Honor, that the interpretation we've offered here is by far the most natural reading of the text. Just like in the other case where there's not an agency-accented issue, we haven't gone so far as to weigh in on whether we think that a contrary approach by the FCC would be permissible. But I don't want to suggest any lack of confidence in our reading. We do think it's by far the more natural one. Well, I guess if you're saying it begins and ends with the text, that doesn't leave much room for the FCC to adopt a different interpretation from the one you're advancing. I think that's right, Your Honor. I don't think there's much room for a contrary interpretation. Again, this is a question on which the FCC has requested comment twice since the D.C. Circuit's decision in ACA International. It's a question that's open on its docket. We are reticent to foreclose any contrary interpretation from the FCC without seeing what they had to say. But I agree with you completely that there's not a lot of room for a contrary interpretation here. But that was a question, not a statement. How do you react to the notion that this is going to have disastrous consequences given technology that has developed since Congress passed this and whether or not those consequences should enter into our consideration? I think a couple things about that, Your Honor. I agree with my friend from Facebook that that shouldn't drive the course analysis here. I think the question is what the statute meant in 1991. I also don't think that it's misconceived, as I suggested, the narrow role that the ATDS definition plays in the statutory scheme. The ATDS definition only implicates the automated call restriction to these sensitive lines, emergency lines, guest and patient rooms, the health care facilities, and cell phones. Thank you, Mr. Ellis. Justice Thomas? Thank you, Mr. Chief Justice. Mr. Ellis, Justice Sotomayor brought up the point of the ill fit between the statute from 1991 and current technology, which is advanced. In 91 cell phones, quite a few of them were the size of a loaf of bread, and they're not in widespread use. Lots of people had car phones instead installed in their cars. We've had in legislation quite a change. The industry's changed. The technology is far beyond anything we could have conceived of in 91. At what point do we simply say, and I understand the statutory construction and what we're attempting to do with this statute, but at what point do we say this statute is an ill fit for current technology? I think in one respect that may be true. I think the best reading of the ATDS definition that I suggested doesn't apply to a great deal of technology that's still in use today. I think that's actually evidence of the TCPA's success and not a reason to update the statute. On the flip side, as you suggest, the respondent's reading of the text does at least present the potential that ordinary smartphones could be made unlawful. I think, happily, the best reading of the text doesn't lead to that result, and that's what we're urging for the court to adopt here. I think the point, what I'm asking, is sometimes we use, I think it's a little odd when we use these, we make great effort to interpret a statute that really wasn't intended for the universe in which we are operating now. At what point do we just simply say that? I think you can say that in an opinion. I think the court's approach shouldn't change based on that. I think the right approach for the court is to still engage with the statutory text as it's written, and if it needs to be updated, to leave that updating to Congress. Thank you. Justice Breyer? No, I won't. Thank you very much. Justice Alito? I have two questions. The first is the one that I asked Mr. Clement. It doesn't make any sense to talk about a system that uses a random or sequential number generator in the very process of storing telephone numbers. The second is this. In order for your interpretation to be right, don't you have to show that there are or were systems that stored numbers using such a generator but didn't use the generator to produce the numbers? If otherwise, there wouldn't be any point in separately covering storage. So if you could cover those two perhaps in reverse order, I would appreciate it. Sure. So I'll start with the latter first. I do think that this statute can be read to cover for the bullet words that do independent work, but let me start by saying that I don't think that's a requirement for the court to adopt our reading. I think that the court is recognizing cases like Remini Street and Atlantic Richfield that sometimes Congress does adopt a belt and suspenders approach, and so at most I think Respondent has shown that that's what they've done here, and I think that's the kind of superfluity that this court would leave the court to ordinarily to disregard the other ordinary rules of grammar or the other candidates of construction. That said, I think, as my friend acknowledged, I think there are two types of ways that autodollars use random and sequential number generators, and I think it's natural for Congress to describe them both. And, in fact, I think if you think about produced in the statute and what it likely means, I think it probably doesn't mean create, as Respondent suggests, because autodollars or HDSs won't be any use if what they do is create brand-new ten-digit numbers that never existed before. They have to identify numbers that existed in the real world and assign to telephone numbers. So they produce a list of numbers. What's strange about that idea? I'm not saying that it's strange to think of a random or sequential number generator as creating ten-digit numbers. I think it's an awkward fit to say it's producing telephone numbers, to be called, if what you mean is create. I think rather what it probably means is bring forth or offer up. And so if that's the meaning that you ascribe to produced, then it's not inevitable that every use of a random or sequential number generator will produce numbers. Thank you. Justice Sotomayor? Counsel, I, from the beginning, have wondered, could a TCPA lawsuit against individual smartphone users actually prevail, given that smartphones don't automatically dial phone numbers in the way that a sequential numbering system does? It doesn't seem like a smartphone can be an automatic telephone dialing system. Am I missing something? Why wasn't that the main reason for reading things against the respondent? Reading this law is not applying to the respondent. So as to whether the TCPA, the ATDS definition, could include smartphones, as you suggest, if you read the second prong of the statute to include an automatic requirement, then I think that at least limits the circumstances in which an ordinary smartphone could be considered to be an ATDS. The second prong of the statute doesn't include the word automatic, and I think it's an open question as to whether that's the right way to read the statute. Courts of Appeals on both sides of the split have assumed that, and the FCC has previously done it, but again, I think it's not actually there in the text. And that's, I think, if you don't adopt that reading, then it's when it begins to present serious problems for ordinary smartphones. All right. Thank you, counsel. Justice Kagan? Mr. Ellis, at the time the TCPA was enacted, there were a fair number of state statutes that dealt with the same general subject matter area, and every single one of those statutes defined an auto dialer to encompass at least some machines that didn't use a random or sequential number generator. So doesn't that suggest that your definition is wrong? I mean, would Congress really have wanted to depart from all of those state statutes in this particular way? Well, I don't think it suggests everything is wrong. I think what it suggests is that Congress approached the same problem in a different way. And so it's true that all or almost all of the state statutes included devices beyond those that use random or sequential number generators, but it's also true that almost every state, I think all but two, only addressed devices that delivered a prerecorded voice and then regulated those devices. Congress came at that same problem in a different way by first prohibiting all prerecorded voice calls to residential lines and to the sensitive lines, regardless of the dialing technology, and then separately prohibiting a subset of calls made with an ATDS using a random or sequential number generator. At the end of the day, it's a similar approach. Indeed, Congress' approach is somewhat broader. It's just a different approach. And why is it that Congress would have adopted that approach? I mean, if I understand what you're saying, you're saying that Congress decided to cover these predictive dialers when there was an automated or prerecorded voice, but not when there was a live person on the line. What sense would that have made? What difference does it make from the recipient of the calls perspective? So perhaps that was unclear. Congress regulates prerecorded voices with not regard to whether they were made, delivered with an automated system at all. And they do that because they think they can. I understand that. But within that, they definitely covered these predictive dialers. Isn't that right? No. Actually, predictive dialers, at least in 1991 as I understand them, typically didn't deliver a prerecorded voice. They connected to a live operator. So I don't think the prerecorded voice part of the statute covers predictive dialers. There weren't any of these that existed that were predictive dialers with a prerecorded voice? There may have been. My point is, in the whole, predictive dialers, the way they work, the whole point of them is to sort of time off the call so that there was a live operator available when the call was connected. They were basically ways to connect live operators. I'm sorry. Justice Gorsuch? Good morning, Mr. Ellis. Two questions. Take them in whatever order you care. First, I think your argument depends upon the possibility that in the world at the time Congress adopted the statute, there were devices that used random number generators to store telephone numbers. So what evidence do you have that that existed in the world, number one? Number two, the same question I posed, Mr. Clement, with respect to what Judge Barrett, in her excellent opinion, called the fourth possible interpretation. I understand the problems with it, but it does overcome this difficulty, and it wasn't addressed in the briefs, and I'm just curious why it wasn't addressed and whether we need to rule it out, or whether it would make any difference going with the first versus the fourth. So as to your first question, whether there were devices in the world that stored using a random number generator, I would point you to the page 19 and 20 of our brief, and then the Pace and Noble Systems amicus brief that goes through this in some detail that describes that automatic dialing systems in 1991 either use a random or sequential number generator to generate numbers and then immediately dial them, or use them to generate numbers, store them for subsequent dialing. And I don't think it's unnatural to describe the latter system as using the random or sequential number generator to store the numbers in the same way that you might say that I have a backup power generator at my home that both generates and stores power for subsequent access, or in the way you might describe using a web browser to download and store a file. That is to say doing something more than just browsing the web. As to the latter second question about why we haven't addressed, I actually do think we did address that. That possible interpretation, we think it is not available because of the comma. No, I understand that. That's not my question. Okay. As to the practical consequences of that, I think you should not leave it open. I think it's not the best reading. I understand that too. That wasn't my question either. Okay. I'm sorry. My question is, does it make any difference in the real world? Yes, it does. And the difference it would make in the real world, at least I think you would understand that calling using a random or sequential number generator, that could describe taking a set list, a sort of pre-selected list, and then calling them in random order. But that's not the problem that Congress was trying to get at with the HDS definition. The problem it was getting at with that definition and the restriction was calling indiscriminately, calling unintentional numbers. That would result in telemarketers accidentally calling emergency lines and cell phones and guest and patient rooms. That was what Congress was trying to get at with the prohibition. Justice Kavanaugh? Thank you and good morning, Mr. Ellis. Justice Thomas and Justice Sotomayor, I think, and others have talked about the ill fit of the statutory language to current technology. And I want to break that down with you a bit because there are two, as you've indicated, two prohibitions here. One is the prohibition on artificial or pre-recorded voice calls. And that covers artificial or pre-recorded voice calls to the house or to the specialized lines. And that part of the statute still makes sense and applies today, correct? Correct. Okay. So then you have the ATDS prohibition, which only applies to the calls to specialized lines, does not apply to calls to the house. And because artificial and pre-recorded calls are already prohibited, must be getting at something different than artificial and pre-recorded calls. And I'm trying to figure out, one, what's that getting at at the time? What was the real world problem? And two, does that have any relevance at all today as Justice Thomas and Justice Sotomayor were indicating with the ATDS prohibition? So I think what it was getting at, Your Honor, was one, it may have also been sort of about suspenders and addressing those pre-recorded calls. Can I stop you right there? Do you think, and this gets to Justice Kagan's question, what Congress was drawing on, do you think they meant and instead of or and made a mistake? No, I guess I don't think that. What I was going to say is I think live calls, live operated calls to those sensitive lines could equally cause problems. You know, I don't think we want telemarketers calling 911 lines or bothering people in their patient rooms at healthcare facilities, or in 1991 making calls to cell phones, which were unintentional at the time and would then cost the call party by the minute. I think those sorts of problems, they're exacerbated by pre-recorded voice calls, but they're caused also by indiscriminate calls that connected live operators. Justice Barrett? So, Mr. Ellis, some of the lower courts have characterized this provision as ambiguous and said that that leaves the FCC some room to choose whether this applies to this kind of stored situation or not. And you, in your colloquy with the Chief Justice, suggested that although the FCC may have a narrow band of authority, you weren't ruling that out either. And I guess I'm wondering if you could explain why you think any kind of Chevron deference would apply here where we have two conflicting choices and we have to decide which is the best one? Because I would have thought that Chevron, that the premise of it is that when Congress deliberately chooses open-ended language or vague language, it's implicitly delegated to the agency a range of discretion to make the choice. But this kind of thorny statutory provision doesn't strike me as reflecting an implicit congressional choice to delegate to the FCC how to regulate this.  Your Honor, I would just say that I think the court has often, in the Chevron analysis, asked just is the statute ambiguous and then took that ambiguity as an indication of Congress's delegation. We haven't addressed those issues here for the obvious reason that there isn't an outstanding agency interpretation for the court to gauge whether it should be a Chevron deference or not. But I think it's a fair question. Thank you, counsel. A minute to wrap up. Mr. Ellis? Thank you, Mr. Chief Justice. I think I'll close with just one more word about the surplusage problem that Respondent was forced to identify. For the reasons I explained, I don't think that government's reading presents any meaningful surplusage. But even if you disagree, I think at most what Respondent has shown is that Congress took a sort of belt and suspenders approach here. He certainly hasn't shown the sort of superfluity that would warrant discarding the ordinary rules of grammar and other canons of construction. And I think that's particularly so in light of the superfluity that Respondent's own reading would introduce. He makes clear on page 37 of his brief that in his view, Congress drafted the ATDS definition to encompass, quote, all technologies used to deluge cell phones with automated calls. But if that were so, it's not clear why Congress would have included the first prong of the definition at all. Under Respondent's reading of the statute, you could strike not just one word, but the entire modifying phrase using a random or sequential number generator, if not all of Section 227A1A, and the ATDS definition would reach the exact same universe of devices. That's the sort of superfluity that the Court ordinarily will not comment, and we urge the Court not to do so here. Thank you. Thank you, Counsel. Mr. Garner? Mr. Chief Justice, and may it please the Court, any method of interpretation, textualism, purposivism, consequentialism, favors affirmance here. Congressional purpose is overwhelmingly clear. It's privacy. Let me focus, though, on text. The issue here involves ordinary lexical meaning, grammar, and cognition. An example, to maintain or acquire lands to be developed using eminent domain. No linguistic rule should lead us to conclude that we must maintain lands using eminent domain. The adverbial modifier links up with the verb acquire. That's ordinary meaning. Other canons are crucial. First, the conjunctive-disjunctive canon. The word or denotes two distinct categories, storing and producing, and the word order is significant. Second, the surpluses canon. The words store and or are given real work to do only on our reading. Third, the harmonious reading canon. The consent provision in this statute makes little sense with random number generation. You obtain consent from known people. Fourth, the presumption against ineffectiveness. Facebook would read the statute into oblivion because robocallers today use stored phone numbers to annoy people, just as they often did in 1991. In Barr, just five months and two days ago, this court repeatedly said that the act prohibits almost all unsolicited robocalls. The borrower's numbers in that case would have been stored. The court, having invalidated the exception in that case, Facebook now argues for an across-the-board exemption. Effectively, all autodialer calls and messages are exempt, they say. In reading law, this is called a viperine interpretation. Like a viper, it kills the statute and privacy. Thank you, Mr. Garner. You agree, don't you, that our objective is to settle upon the most natural meaning of the statutory language to an ordinary speaker of English, right? Yes, Your Honor. So if these various rules of construction, viperine or something else, those are only pertinent. We don't assume that the ordinary speaker is applying those canons or rules of syntax at all, right? Your Honor, that's correct. Most native speakers of English, competent users of the language, understand. For example, cookbooks are full of statements that say, using a spatula, lift the omelet and tilt the pan. Nobody stops to parse it and say, oh, do I have to use the spatula to lift the pan? So the most probably useful way of settling all these questions would be to take a poll of 100 ordinary speakers of English and ask them what it means, right? That would be the most useful rule of construction. I'm not sure that we would just take a poll of everybody and say, I mean, I think it would be a useful datum, yes. Okay, so just shifting a little bit here, you say that if Facebook wins, we'll all be flooded with robocalls. Doesn't the statute independently bar calls with artificial or prerecorded voices, which I think is what most ordinary speakers of English would regard as a robocall? Your Honor, the difficulty with having ordinary speakers or readers who try to read a legislative definition like this is immediately people would be a little bit befuddled by the legal language. They just would. Well, lawyers too, I guess. But the point is that Congress didn't write the legislation with technical rules in mind, and I think ordinary speakers wouldn't read them that way. And so the most useful tool is kind of your first blush reading it in terms of how it makes sense, and I think most people's first blush would suggest that your friend on the other side's reading makes the most sense. Your Honor, I respectfully disagree if you take into account the actual meaning of the words, but if you just looked at it sort of mechanically and hastily, yes, it's possible that that is the way it would strike people. As Justice Holmes once said, a well-drafted statute, this is paraphrasing slightly, a well-drafted statute must be able to withstand attacks by an intellect fired with a desire to skew the meaning, and I think that's a problem. What significance does it make that the ordinary speaker of English we've been talking about would have a very different knowledge background about these things today than one would have in 1991? Your Honor, I believe that TCPA is more important today than ever because of advances in technology. The social media companies know exactly where you are at all times. They know every mouse click that you've made for the last 20 years, and they can target in a very manipulative way. So the basic technology of getting a message through to somebody who's carrying a handheld device remains the same. Thank you, counsel. Justice Thomas? Thank you, Mr. Chief Justice. Mr. Garner, sort of taking off your last point, the technology has changed. I think we're talking about the average person. Most people would have no idea today what some of the technology was. In 1991, a pager, most people would not realize that caller IDs were cutting edge and had to be purchased separately, that most people did not have cell phones. In fact, very few people did, and they were large, and car phones had to be installed. So technology has changed and moved along very rapidly. Don't you think it's rather odd that we are applying a statute that's almost anachronistic, if not vestigial, to modern technology like Facebook and instant messaging, et cetera? Don't you think that at some point there's at least a sense of futility? Your Honor, I don't. The average American is very well familiar with robocalls and understands that these numbers actually doesn't care whether they were randomly generated or whether they were sold because they gave their number to somebody and, in fact, would probably be more offended if they understood that somebody that they had dealt with and trusted had sold their numbers. But you make my point because it doesn't have to be randomly generated anymore. It's generated in other ways, but you make my point about technology in the old days. It would be randomly generated because there was no way anyone could have that much information and use it that instantaneously. Your Honor, in 1991, there were lots of SOAR numbers that were called. In fact, I hesitate to talk about legislative history because I don't like talking about legislative history, but lists and databases of known numbers came up over 200 times. Generators came up only four times in the whole legislative history. Thank you. Justice Breyer? Interesting. Your Honor, let's go back to when they wrote it. As you read it, it is unlawful to call a hospital, for example, using a phone that stores telephone numbers. Period. Right? Is that right or not? That's not quite right, Your Honor. It's illegal for the equipment to call. It has to be an automated dialing system, not just a telephone. Okay, so you can't have equipment. Well, where is the automated? Where did it say that? Let's see. Using an automatic system, I get it. Okay. Yes. So you can't use an automatic system that stores numbers. Now, then, were there a lot? Your Honor, there were databases. Were there a lot? What was the situation like then? Your Honor, there were databases and lists that were sold, and there were also numbers automatically generated. But those are shots in the dark. That's why those have become superseded. Facebook's interpretation. Okay, I got it. At the time, there were systems that stored numbers both ways, and that's why you think they wanted to get it both ways. Yes, Your Honor. Then over time, what happens is the world changes, so everybody and his uncle has a system that fits within that ordinary definition. Cell phones, storing, and then automatically dialing. We all have one. And so it gets too broad, and so should you narrow it? Now, that seems like the converse of a situation where, you know, the famous, you know all these examples. The silver fox is not thought to be an endangered animal, an endangered species. When they wrote the statute, but later it is, and so you say, was there a dynamic meaning, which changes over time to pick things up, or is it static meaning?    they didn't use the statute, they just looked back to see what they intended at the time. And Nino Scalia used to say, oh, that's just done to expand the statute. But here we're using it to contract the statute. Any comment? Is that totally wrong? I suddenly began to think about it that way. Reading it to be just random number generators, which produce numbers, to that specific technology would wither the entire statute. That's why I called it a pipeline. It would contract it. You say wither, that's pejorative. But so often we interpret a statute dynamically to adapt to changing circumstances, looking at the context in which it is passed and how it's changed in order to decide how to do so. And to do so here, there are a few words over there that really help. Is there anything wrong with reading a statute? Looking for the intent in terms of change over time. Did Congress intend it to change over time? Has technology changed? And then using the tools at hand in the context at hand to produce a more sensible interpretation. What do you think? Your Honor, I have no quarrel with any justice who wanted to do that. I look after you in your expert view. What do you actually think about such a thing? I haven't really seen it. I just suddenly occurred to you that this fits in that box possibly. I'm a proponent of the sixth meaning canon, but I do think that the word store and or, it makes Congress look almost prescient. Given what has happened in the last 29 years, Congress looks prescient, having said store and or, before producing. All right. I'll think about it. Thank you. Justice Alito? Guido Calabresi has argued that courts should have the power to declare statutes obsolescent and obsolete. If we have that power, this statute might be a good candidate, but we haven't claimed it so far. Assuming we don't, perhaps we have to put out of our mind the whole parade of horribles that arises as a result of the advent of smartphones and social media. If we think about the technology that existed at the time when this statute was enacted, the bit of technology that seems to me to provide the greatest practical problem for your interpretation is call forwarding, which I think was widely available when this statute was enacted. Would any machine that had a call forwarding capacity at that time be covered under your interpretation? Your Honor, no, nor would an immediate answer. In fact, a normal cell phone and normal uses of cell phones do not amount to an ATDS. It would have to be altered significantly to become an auto dialer, but human intervention is the thing that makes it something that is not automatic. Anything that needs a push of a button to send a message, automatic dialing has been pre-programmed to send messages automatically at intervals without human involvement. Well, isn't it true that at least as of now, everything that computers do requires at some point some degree of human intervention, some degree of human instruction? That is true, Your Honor, but that involves not uploading a list of numbers. That involves human involvement, but it's the selecting of the number to be called and when to call. That is the human intervention, the immediate placing of the call that the FCC, the ACA, and the D.C. Circuit and the 11th Circuit have all held that human intervention does exclude those calls from definitions of ATDS. How would you define the degree of human intervention that's required? Your Honor, it could be pressing buttons. It could be clicking a mouse on a number. It involves a human being placing, sending a message, or placing a call, and it's the direct placement of the call. Thank you. Justice Sotomayor? Counsel, if we rule your way, the logical consequence is that every cell phone owner would be subject to the harsh criminal and civil penalties of the CPA. Could you give me a reason other than that it hasn't happened yet for why Congress would have intended that? And by the way, it seems don't please don't answer by saying it hasn't happened yet, and the reason I say that is because if you get a ruling in your favor, I know for sure that there will be lawsuits against individuals that will follow. And, Your Honor, I believe Article III judges know how to deal with those I imagine to be frivolous claims. But Facebook's scary argument that all cell phones might, with alterations, be made into automatic dialers, really should be no more availing than the realization that all of us have hundreds of deadly weapons in our homes. Law-abiding Americans just don't use rope and kitchen knives that way. I think you're going to have to answer me more clearly than that. You don't think that cell phone users will do what? They won't do automated mass dialing or blitz messaging, which isn't a normal function on a cell phone? Well, I mean, I do email blasts with friends. I do all sorts of, now with FaceTime and things of that nature, Zoom, we're doing basically automatic dialing and people being joined together by that process. I, for one, don't believe that we should think that our interpretation couldn't affect the development of new technology to help people do things more quickly, but in the process end up violating the statute. Your Honor, it seems to me that this court, like the D.C. Circuit, could actually disclaim the result that normal uses of cell phones would produce liability. But there is a question of functional equivalence, and the prohibition speaks of consent. The difference between text messaging groups and friends is that everybody has consented. There's not a problem. The difficulty is when people's privacy is being invaded. That's what the statute was driving at. Justice Kagan? Mr. Garner, you started off by noting that there are some kinds of statutes or sentences where the meaning of the words is so clear that the mind gravitates toward the ungrammatical reading, and that might well be, but would you at least acknowledge that the reading that you are asking us to adopt is in fact ungrammatical, that you have two verbs, store and produce? They have a shared direct object, numbers to be called, and then a modifier following all of that. So sort of setting aside the semantic arguments for the moment, do you agree that the grammar favors Facebook? No, Your Honor. I don't think there's anything ungrammatical about this sentence. It's an unusual sentence, unusual syntax. It rather shows the infinite variety of kinds of sentences that English speakers can devise. But just as in using a spatula, lift the omelet and tilt the pan, there's nothing ungrammatical about that. There's no rule of grammar that any grammarian has recognized that would render this ungrammatical. Perhaps a little awkward, but not ungrammatical. Well, I think you just made the statute into something that's not. I mean, you took out the shared direct object. You took out the fact that the placement of using a random number generator phrase is after both verbs. So you considerably cleaned it up, I would say. Your Honor, maybe my better example is to maintain or acquire lands to be developed using eminent domain. Well, that's one where I take the point that it's just like sometimes grammar has to give way because the meaning is so clear, and there the meaning is so clear because you can't imagine eminent domain being used to maintain land. It's kind of like that's impossible. And so, too, for your argument in your brief about, you know, what does it mean for a domestic airline to drive? But I think that the point that Mr. Clement might make here is that the meaning here is not so impossible. You know, there's a little bit of awkwardness about saying that a number generator stores numbers, but actually that can be explained by looking at the kinds of dialing devices that existed at the time, where there were devices that generated numbers for immediate dialing and devices that stored numbers for later dialing. So if that meaning is possible, shouldn't we go with that meaning when combined with the fact that it's the most grammatically proper way to read the sentence? Your Honor, again, I would not concede that it's a more grammatically proper way of reading the sentence. To me, if you look at the sentence, it seems clear and deducible from the text itself that Congress was concerned about known numbers, previously known numbers obtained from any source. Those are stored, and numbers not previously known but generated by one of these machines. That covers the universe of numbers, and the wording therefore makes sense. Another little thing I might mention linguistically is that some verbs, lexical verbs they're called, feel complete on their own, and store is one of those. We all know what computer storage is. But a word like produced, if you say, and produce the numbers, what does that mean? It's sort of like a sentence, the bird chirps and lies. We know what the bird chirps means, but lies, what do you mean lies? Well, the bird chirps and lies comfortably in its nest. Now, we wouldn't think that comfortably modifies chirps. And it's that kind of need to have the adverbial modifier explain to us what we mean by produce. Computer production could be the manufacture of computers. It just doesn't feel complete. I think that's the reason for the – Thank you, Mr. Garner. Yes. Justice Gorsuch. Good morning, Mr. Garner. Good morning. You conceded that the grammar here is awkward, but I'd like to pick up where Justice Kagan left off. And I think you certainly have an argument that grammar doesn't exhaust meaning. Fine. But on what basis is this sentence grammatical? I think it's so awkward, I'd anticipate you'd rewrite it if it were given to you. And when we look at the adverbial phrase, there's nothing to indicate in the statute that it modifies only one of the verbs. And rules of grammar usually indicate that when you have a clause like that offset by a comma, it would modify both of the prior verbs, right? No, Your Honor. That is a rule that you sometimes find as an exception to the rule of the last antecedent. That's about the only place. And you find that rule only in law books, not in grammars. It's unrecognized by grammars. But the point of cynicism is simply that we must look at the semantic content of the words. We don't take the words as just fungible morphemes and say once you hit the comma, everything before it gets modified. Well, let me ask you this. In response to Justice Alito, you were talking about what happens if we were to interpret the statute your way. And I guess I'm still a little unclear about the answer there. To store a number, if it's totally divorced from the random or sequential number generator, and then to dial such number would seem to be enough. Others have worried about our contemporary cell phones that can do that. But even at the time of the statute's adoption, there were phones that captured numbers that had been dialed and you could press redial. Why wouldn't – and that was common even in the 1990s, I believe, certainly a lot earlier than cell phones. Why wouldn't this statute make a criminal of us all? Your Honor, each of those actions that you describe involves human actuation. I understand it requires a human person to push the redial button, but in what way does the statute require that on your reading? Just to make sense of the provision. Well, all the statute says is you have to have equipment that stores a number and can be used to dial the number. I don't see where it excludes human actuation as part of the equation. Well, that's the word being defined, automatic dialing system, and it must be the equipment itself that does the dialing. No, the equipment has to have the capacity to store and it has to have the capacity to dial. It doesn't say it must do it solely by itself. I mean, now we're really changing the grammar, aren't we? No, I don't mean to, Your Honor. That is in the definition, the capacity to store and dial. Right, and a capacity to dial. Nobody doubts that my redial button, my phone with a redial button circa 1990 has a capacity to redial a stored number. Really? Your Honor, it's not considered automatic when you place the call, if you press the button. Congress can define anything to mean anything it wishes, right? That's correct, Your Honor. All right, so it can define an automatic dialing system to mean whatever it wishes, and here it defined it to mean equipment which has the capacity to dial a stored number on your interpretation. Yes, and the equipment itself does the dialing. Where does that come from, though? You're putting in a lot of words there. I don't think so, Your Honor. I'm looking at the definition itself. The term ATDS means equipment that has the capacity to dial such numbers. It's the equipment that dials, and the word automatic is the word being defined. That's where the courts and the FCC have gotten the idea that human intervention is so critical to take normal cell phone use out of the realm of ATDS. I certainly understand that it's necessary to avoid a parade of horribles. Thank you. Justice Kavanaugh. Thank you, Chief Justice, and good morning, Mr. Garner. Good morning. This case will depend heavily ultimately on the text, and that's been well covered in the briefs and in other questions. I'm not going to belabor that in my time, but I want to ask some more questions to follow up on my prior ones, trying to understand how this worked in 1991 and how it works now and what it's getting at. First of all, even if we agree with the other side here, robocalls are still prohibited, meaning artificial or prerecorded calls. That part is not affected. It's not involved in this case. That part of the statute is not obsolete at all, and that's part of the statute, even if you were to lose, will still operate to prohibit prerecorded or artificial calls to the home or to cell phones, unless an exception applies. Correct? Your Honor, I don't believe that is correct. Robocalls is defined in the TRACE Act from last year. Congress defined it to include all violations of this statute. That is robocalls. Assume I'm using it just to mean artificial or prerecorded calls. Yes. Okay, if I use it that way, that part of the statute is not an issue in this case. That part of the statute will still apply, even if you were to lose this case. Correct? Yes, Your Honor. Okay. Then you said that the purpose, I think you started with this, the purpose of this separate ATDS prohibition, separate from the prohibition on artificial or prerecorded calls. The purpose of this was privacy, at least in part, I think you suggested. The problem in C- Yes, Your Honor. The entire TCPA is about privacy. Okay. But this provision in particular, and the problem with the structure of the statute that that creates is that the ATDS prohibition does not apply to calls to the residents. And that suggests that the ATDS prohibition is about something other than privacy. How do you respond to that? Your Honor, there were different protections given in different ways by Congress. The residents did prohibit those prerecorded calls. And they also have a do-not-call list that they're protected by. In the case of cell phones and pagers and emergency numbers and so on, it was a do-not-call mandate across the board, unless you have consent or it's an emergency. So there were reasons, perhaps, for this. One is that cell phones are carried on the person, and they're therefore with you at all times. Like pagers, they receive text messages, and residential lines don't. And people were having to pay for receiving calls. And some people still do, by the way, on some plans. But as one of the opinions in Barr said, in 1991, the cell phone owner not only suffered the pleasure of receiving robo-calls, but also paid for the privilege. Okay. As you referenced in the brief, the state statutes, those, of course, prohibited, at the time, ATDS technology combined with prerecorded or artificial messages. Congress severed those two things and separately prohibited prerecorded or artificial messages and then separately ATDS, even with a live operator, presumably. Doesn't that suggest the state statutes aren't especially probative here? Your Honor, I think they are worth looking at. For example, the placement of using a random or sequential number generator. But there was a great deal of variation among the states, and what we ended up with is a federal statute that is very nuanced and represents a great many legislative compromises. Thank you very much. Justice Barrett? Mr. Garner, you've talked in response to a number of the questions that you've been asked about the need for human intervention. In response to Justice Gorsuch, you talked about the finger hitting the redial button or the finger hitting the stored number in the phone. What about using the auto reply function on an iPhone? So I can set that up to say, do not disturb me, I'm driving, or do not disturb me, I'm sleeping, and I can program the phone, and it just comes with the iPhone, it's not special software, to be sent to my favorites or to all my contacts. So is that the necessary human intervention? I'm not pressing the button each time. Your Honor, it's not an auto dialer because the communication is prompted by the person. That's not what I asked you. I asked about human intervention. Is that considered human intervention? I think that is a different circumstance, Your Honor, where actually programming it would not involve human intervention, but the consent provision thinks about the provision. I'm not asking whether, Mr. Garner, I didn't ask whether it was covered by the statute. I asked you whether that counts as human intervention. Because a lot of your argument leans on this idea that, well, you know, human intervention means that we're pressing the buttons on the phone that automatically make the call. Justice Alito asked you, you know, how far back does that go, because obviously human intervention is present at some point. And, you know, many people, your opponents, several of the lower courts, the Seventh Circuit and Cadillac, have said that it seems like, on one reading of the text, the auto reply function would be brought within the statute. And I'm not asking you for all of the arguments to that effect. I'm only asking you about the human intervention point. Would that be enough? One step removed by using the auto reply function, does that count as human intervention? Your Honor, I don't believe it is. And why? How do you tell when human intervention is close enough to not be human intervention anymore or to be human intervention? There are difficult cases in shades of gray. And I think a clean, the clean bright line test that Congress devised is consent. The idea that there are going to be a lot of cases about the degree to which. Okay, Mr. Gardner, let me just stop, because I wasn't asking about the consent, because I want to ask you about something else too. So you talked in your brief about this concept of senescence. And I'm wondering whether you can identify any case, because your opponents say there is none, in which a court has relied on that concept. And I ask because it strikes me as the kind of concept that might make sense in some interpretive context, when one interprets some kind of language, say literary language. You lean heavily on this idea that the ordinary speaker of language or what would make sense to people. And senescence kind of gets at that but gives it a different name. Is that a legal concept? I mean, you actually, you and Justice Scalia don't talk about it in reading law, but you do talk about it in modern English usage, which of course gets at a far broader range of interpretive problems and grammar problems. So is it a legal concept? Is it appropriately applied in the law? Your Honor, it's a linguistic concept that has been often recognized in the law. In fact, this court has frequently said that we go by the sense of the words more than by some pedantic rules of grammar. The courts said that through the decades many times. And is that a proposition that you would endorse? It seems like going through the sense of the words and the purpose of the statute would be contrary to the mode of interpretation that you've endorsed in other contexts. Your Honor, I don't endorse that broadly, as it commonly appears. It tends not to appear in the post-Scalia years. And I don't endorse it broadly. And yet it does recognize that we must look at the sense of the words to understand the sentence. Thank you, counsel. Mr. Garner, you can take a few minutes to wrap up. Thank you, Your Honor. I'll take 60 seconds. On Facebook's reading, it would have been possible, even in 1991, to download the entire phone book and auto-dial every number with impunity, thousands per minute, as long as you stored the numbers on a floppy disk or hard drive. Just don't store them on an algorithmic number generator, a piece of equipment, not even meant for storage. The statute never sensibly meant that. This case isn't about cell phones calling. It's about cell phones being called. It's about computer systems that send out millions of illegal calls and messages per day. There's no reason to think that Congress thought haphazard non-consensual calls to be bad, but targeted non-consensual calls, far more intrusive, to be quite acceptable. In Barr, this court said that debt collectors aren't free to send in the robots. Now Facebook wants to free up all the robots for unsolicited calls. We urge the court to reject this misreading and affirm. Thank you, Mr. Garner. Mr. Clement, rebuttal. Thank you, Mr. Chief Justice. Just a few points in rebuttal. First, the point has been made that there's some awkwardness between talking about the verb store and using a random or sequential number generator. That awkwardness can only matter for one of two reasons. One, it could matter if it were just impossible to use a random or sequential number generator to store numbers. But it's not impossible. It's not technologically impossible, as the Pace and Noble brief makes clear, nor is it impossible as a matter of ordinary usage, because as long as I'm using the generator as part of the storage process, the word makes sense just like dialing using a random or sequential number generator. The other reason it could matter is because there's a superfluity problem, such that anything that uses a random number generator to store numbers will also use the generator to produce the numbers. But if we're talking about superfluity here, there's a far greater superfluity problem on the respondent side of the case, because they would essentially read the words using a random or sequential number generator out of statute. And you can't read this statute, particularly when you understand the limited scope of the ATDS prohibitions, without thinking that that phrase is a part of the statute. Second, there's been some discussion about how automatic something needs to be and whether that could save the cell phones. There's two points to make about that, Your Honor. First of all, the adverb automatically, the adverbial phrase without human intervention, the adverbial phrase en masse, none of those phrases is in the statute. And what is in the statute and the modifier that actually gives an automatic telephone dialing system a sense of automaticness is using a random or sequential number generator. But even if you read that word into the statute, it doesn't solve the problem. If I tell Siri to dial a number from one of my stored contacts, that's about as automatic as dialing gets. And call forwarding, even back in 1991, was just as automatic. You'd call somebody's number thinking you were getting one line, and it would automatically forward you to a different line. And of course, if you typed in the wrong line to forward it to, you could be looking at a lot of liability under the TCPA. Finally, a lot of discussion about the importance of 1991 versus 2020. Obviously, 1991 is what's most important for interpreting the statute itself. And if you look at that, things even that existed in 1991, like call forwarding, the problem was raised, and the response from the SEC was, no, look at the statute. Those aren't covered because they don't use a random or sequential number generator. If you look at the testimony before Congress in 1991, it's telling. The Direct Marketing Association didn't oppose the automatic telephone dialing system prohibition because that's not what they were doing, even though they were using stored lists. The person who opposed it was a guy named Ray Coulter, who made these automatic dialing systems that used a random or sequential numbering device. And lastly, just to be safe, the 2020 may be relevant, particularly for constitutional avoidance. So for all those reasons, Your Honor, we ask that you reverse the Ninth Circuit. Thank you, Counsel. The case is submitted.